IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ANTHONY GOLSTON, #143325,    )
      )
    Plaintiff,    )
      )
v.    )    CASE NO. 2:11-CV-946-MHT
    )    [WO]
      )
GARY HETZEL, *et al.*,    )
      )
    Defendants.    )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This 42 U.S.C. § 1983 action is pending before the court on a complaint filed by Anthony Golston ("Golston") challenging a myriad of conditions of confinement, the violation of administrative procedures and an alleged use of excessive force against him on December 8, 2010 during his incarceration at the Easterling Correctional Facility ("Easterling").  The plaintiff names Warden Gary Hetzel, Warden Kenneth Sconyers, Capt. Gwendoly Babers, Sgt. Kerry Williams and Sgt. Matthew Enfinger as defendants in this cause of action.  The plaintiff seeks a declaratory judgment, injunctive relief, monetary damages and "whatever else the Court deem[s] appropriate."  *Complaint - Doc. No. 1* at 4.[1]

---

[1] The court construes this latter "catch all" request for relief as one which encompasses a request for nominal damages.  *Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003) ("Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages .").

The defendants filed a special report and supporting evidentiary materials addressing the plaintiff's claims for relief.  Pursuant to the orders entered in this case, the court deems it appropriate to treat this report as a motion for summary judgment.  *Order of January 31, 2012 - Doc. No. 15*.  Thus, this case is now pending on the defendants' motion for summary judgment.  Upon consideration of this motion, the evidentiary materials filed in support thereof and the plaintiff's response, the court concludes that the defendants' motion for summary judgment is due to be granted in part and denied in part.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[2]  The party moving for summary judgment "always bears the initial responsibility of

---

[2]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  Fed. R. Civ. P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id*.  "'Shall' is also restored to express the direction to grant summary judgment."  *Id*.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

The defendants assert that they have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact with respect to the claims presented by the plaintiff. Based on the foregoing, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

3

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted).  Consequently, to survive the defendants' properly supported motion for summary judgment, Golston is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e).  "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Id*. at 249-50.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 242).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment.  *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions . . . , in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment.");  *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment

4

appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment . . . ."); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Sw. Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children and Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary

judgment.").  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper.  *Celotex*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine

dispute of material fact.  *Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).  Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.  In this case, Golston, through the submission of his sworn complaint and affidavit, has demonstrated a genuine dispute of material fact in order to preclude entry of summary judgment on his excessive force and failure to protect claims.  The defendants, however, are entitled to summary judgment on Golston's remaining claims for relief.

### III.  CLAIMS FOR RELIEF

In his complaint, Golston alleges that during his incarceration at Easterling the facility was overcrowded, understaffed and underfunded causing a myriad of alleged unconstitutional conditions and actions to occur.  The challenged conditions and actions presented by Golston include the following allegations:  (a) Segregation cells are in various stages of disrepair, i.e., broken or missing windows, leaking sinks/toilets, missing paint and inadequate lighting; (b) Chain locks on segregation doors create a security hazard; (c) The segregation unit is not properly ventilated; (d)  Some segregation cells cannot be monitored by the cubicle officer; (e) Officers do not conduct 30-minute cell checks; (f) At times, raw sewage enters the cells and tiers; (g) Certain segregation cells have only a small window in the door; (h) No classification system exists to determine cell assignments; (i) Food is served through rusted tray slots; (j) On occasion, segregation inmates are served different

menu items from general population inmates, i.e., population was served french fries whereas segregation received boiled potatoes and population had a choice between coffee and juice while segregation was provided only coffee; (k) Meals are not transported in insulated containers and the food is often cold; (l) Black inmates are not furnished lotion for their skin, grease for their scalp or hairbrushes which causes some inmates to suffer irritation to affected areas; (m) The water pressure is inadequate for showering and tastes foul absent ice; (n) Institutional rules are not posted for review by inmates; (o) Walkways are not covered and inmates are exposed to the elements when walking to/from the health care unit, chow hall and other areas of Easterling; (p) The law library is inadequate and segregation inmates lack access to necessary legal materials and assistance; (q) Segregation cells are inappropriate in size to house more than one inmate; (r) Inmates are denied personal shoes and issued only blue slippers while in segregation; (s) Inmate jobs and educational opportunities are limited and accessible only by inmates with appropriate institutional records; (t) Some privileges are denied inmates in segregation; (u) Inmates are charged a $3.00 co-pay for medical treatment and a $1.00 processing fee upon receipt of a money order; (v) Unauthorized forms are used to initiate citations and disciplinaries against inmates; (w) Access to dental care is limited solely to inmates with chronic ailments; (x) Correctional officers confiscated his white state-issued jeans upon his arrival at Easterling while other inmates were allowed to maintain possession of their white jeans;

and (y) Correctional officials disregard administrative regulations in dealing with inmates both in segregation and general population.  Golston also alleges that Officer Matthew Enfinger subjected him to excessive force on the evening of December 8, 2010 by repeatedly punching him in the face absent provocation or need for the use of force while Sgt. Kerry Williams failed to intervene to protect him from this assault.

## IV.  DISCUSSION

### A.  Absolute Immunity

With respect to the alleged constitutional violations Golston lodges against the defendants in their official capacities, they are entitled to absolute immunity from monetary damages.  Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity."  *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).

> A state official may not be sued in his [or her] official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 908, 79 L. Ed. 2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S. Ct. 1114, 1125, 134 L. Ed. 2d 252 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities.

*Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997).  In light of the foregoing, the defendants are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities for

asserted violations of Golston's constitutional rights. *Lancaster*, 116 F.3d at 1429; *Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994).

### B. Speculative Claims

To the extent Golston presents claims based on a fear of conditions or actions which could have but did not occur during his incarceration at Easterling, these claims do not warrant constitutional protection. Mere suppositious allegations that conditions ***could*** subsequently result in constitutional violations and/or that prison officials ***may*** at some time in the future act unfavorably towards an inmate fail to implicate a constitutionally protected interest. *Conner v. Sticher*, 801 F.2d 1266, 1268 (11th Cir. 1986) (plaintiff's subjective belief harm may occur provides no basis for relief); *Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (jurisdiction cannot be premised upon mere speculation); *Carter v. Heard*, 593 F.2d 10 (5th Cir. 1979) (Relief is not warranted when "the injury which [plaintiff's] pleadings contemplate is fancied, not real; prospective, not actual; and imagined, not threatened."). Thus, claims based on possible future adverse actions or conditions are subject to dismissal as these claims are purely speculative and without constitutional implication.

### C. Lack of Standing - Claims Alleged on Behalf of Other Inmates

Standing is a cornerstone of American jurisprudence on which jurisdiction lies. "[A] litigant may only assert his own constitutional rights or immunities." *McGowan v.*

*Maryland*, 366 U.S. 420, 429 (1961) (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 218-19 (1974) (plaintiff must assert a legally cognizable injury in fact before federal courts have jurisdiction). "The essence of a standing question is whether the plaintiff has alleged 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions[.]'" *Saladin v. City of Milledgeville*, 812 F.2d 687, 690 (11th Cir. 1987) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)); *Harris v. McRae*, 448 U.S. 297, 320 (1981) (same).

Standing involves two aspects. The first is the minimum "case or controversy" constitutional requirement of Article III. *Saladin*, 812 F.2d at 690. "To satisfy this 'irreducible' constitutional minimum required for standing, a litigant must show 1) that he personally has suffered an actual or prospective injury as a result of the putatively illegal conduct; 2) that the injury can be fairly traced to the challenged conduct; and 3) that the injury is likely to be redressed through court action." *Saladin*, 812 F.2d at 690 (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*, 454 U.S. 464, 472 (1982)); *Warth v. Seldin*, 422 U.S. 490, 499 (1975). If any element is lacking, a plaintiff's claim is not viable. In addition, the Supreme Court has established several requirements based on prudential considerations. *Saladin*, 812 F.2d at 690.

> The Supreme Court has also stated that, in addition to these essential constitutional requirements, a court should consider the case in light of three principles which might counsel judicial constraint, referred to as "prudential" considerations . . . . Those considerations are 1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue; 2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and 3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties.

*Id.* (internal citations omitted).

The instant complaint references claims relative to conditions of confinement and actions to which other inmates may or were subjected during their confinement at Easterling. With respect to the claims arising from alleged violations of other inmates' constitutional rights, Golston is not "asserting [his] . . . own legal rights and interests [but] rather . . . the legal rights and interests of third parties." *Id.* In accordance with applicable federal law as set forth herein, Golston lacks standing to assert these claims. Summary judgment on such claims is due to be granted in favor of the defendants. This court will henceforth address those claims for which standing exists.

### D.  Conditions at Easterling

The correctional defendants deny that the conditions made the basis of the instant complaint rise to the level of constitutional violations. Warden Sconyers addresses these claims as follows:

> Inmate Golston complains that numerous physical structures and

equipment including segregation cells, toilets, windows, sinks, doors, etc. are dysfunctional (sic). That is incorrect. In addition, our maintenance personnel work closely with our Segregation Commander and Shift Supervisors to ensure that the ongoing needs for repairs throughout the institution are quickly satisfied.

Chains [which] are attached to doors can be easily removed without the use of keys. They exist to prevent inmates from kicking and/or rigging cell doors to open without authorization. Cell[s] are ventilated by a large window at the rear of each individual cell, a small viewing window approximately 6" x 6" in the door, and a space below the door. Exhaust fans are utilized to increase air flow if needed. All cell doors can be viewed from the cubicle. Inmates inside some cells do not have a direct view of the cubicle operator. Regular cell checks at 30 minute or less intervals are routinely conducted and counts of individual cells occur a minimum of six times daily. Documentation is affixed to each cell door to ensure that no cell occupant is housed with a known enemy. The Classification Unit works closely with the Wardens and Segregation Commander to ensure safety to each inmate assigned [to segregation].

Segregation inmates receive the same portions of food items as population inmates. Food is transported from the Kitchen to the Segregation Unit via enclosed thermal trays that are adequately designed to maintain proper food temperature. Food trays are passed through openings (Tray Doors) in each cell door. Tray doors are routinely painted to eliminate rust.

No inmates in Segregation are allowed to possess items that promote homosexual activity and violence, i.e. grease, lotions. There is no discrimination applied to black or white inmates [regarding possession of grease, lotion or other restricted items]. The water used by Segregation inmates is the same as that used by personnel throughout the facility without complaint. Each cell is equipped with hot and cold running water. Ice is provided with the drink served during each meal. Additional ice is provided during hot weather. Segregation cells are routinely cleaned by the occupants, by assigned inmates prior to filling an empty cell, and during other times as needed. There are no mirrors in individual cells. Mirrors for shaving are located in shower areas.

Inmates are not placed in segregation as a result of receiving Behavior Citations. Inmates are often placed in Administrative Segregation pending further investigation [of potential rules violations]. Some inmates receive formal disciplinary action as a result of the investigation. Investigations

often clear some inmate suspects who are then released from investigative status. Upon their release, they may either receive a Behavior Citation for a lesser charge or receive no action. Inmates do not remain in disciplinary status past their out dates. Except in extreme incidents such as riots or disturbances will three inmates be temporarily housed in a Segregation cell. I have no knowledge of the restriction of any privileges to Inmate Golston except those imposed through approved disciplinary action.

Inmates in the Segregation Unit are issued one set of prison whites in order to be escorted to the Health Care Unit and other necessary locations. Jumpsuits, which are also issued, have no belt loops for the placement of belly chains. All inmates assigned to the Segregation Unit are issued slip on shoes that have no shoelaces that can be used for illegal purposes. Inmates' laundry in the Segregation Unit is collected and returned at a minimal of three days per week and as often as daily during weekdays. I have seen no complaint other than that of Inmate Golston as to clothing being wet upon return from the laundry.

Inmate Golston is correct that the institutions are crowded. The Department of Corrections determines the number of inmates assigned to our facility. Noise is not excessive. There are no areas of the institution where raw sewage is standing.

Every inmate is required to attend an orientation program upon arrival to Easterling. There he is apprised of rules, regulations, and procedures of the institution. Institutional Inmate Handbooks are available for review in each dormitory cubicle and the law library. Additional rules are listed in the daily inmate newsletter and on bulletin boards in each dorm.

Easterling is a large open facility with individual dorms arranged around the inner perimeter. Covered walkways exist along the areas near the Trade School, Kitchen, Health Care Unit, and Receiving Unit. The are no walkways extending from dorm to dorm.

The law library is adequately equipped with up to date references on compact disc. Inmates in Segregation may request legal references and materials twice per week from the law library personnel Population law library time is granted daily upon written request.

As approved by the Department of Corrections, inmates are charged a $1.00 processing fee for all money orders received.

Inmates who sign up for sick call are sometimes treated by Nurse Practitioners. If a medical need exists, an appointment is scheduled [by the reviewing nurse]. Emergency medical attention is provided for serious

14

illnesses.  Dental cleanings are prioritized [by health care personnel] for those inmates whose dental care is necessary due to their health and/or condition such as diabetes [but all inmates are allowed access to dental treatment].  A $3.00 co-pay is charged each time any inmate signs up for sick call screening.  Inmates on the Chronic Care program are exempt from this charge.

Our facility strives to provide and practice the fair and consistent treatment of our assigned inmates.

*Exh. B to the Defendants' Special Report - Doc. No. 14-2 at 1-3.*

In addition, Warden Hetzel avers that:

• The Segregation cells are in good repair and are in the process of being painted.

• The doors [in segregation] . . . are not in violation of safety codes.

• There is proper ventilation within the Segregation area.

• Cubicle officers have view of the cell doors, not the inmates in the cells as this is security standard.  Windows are in the doors for the roving correctional officers to perform their cell checks.  There are cell checks, which are properly documented.

• No more than two (2) inmates are assigned per cell.

• There are no [raw] sewage issues.  There is hot and cold running water in the Segregation area.

• There is a classification process and enemy declarations that assist in the placement of inmates in their cells.

• Food portions are the same in the Segregation [Unit] as in Population.  Food is served in insolated (sic) trays to allow the food to stay warm.

• Hygiene items are not taken from inmates; however, items are limited due to the inmates' status and placement in Segregation.  Lotion and grease are

not allowed [for security reasons].

• Ice is passed out during all months, especially during the summer months.

• Cleanliness of a Segregation cell is left to the individual inmate assigned to the cell.  Cleaning supplies are offered to the inmate for his use.

• It is true there are no mirrors in Segregation.  This is a safety issue as an inmate may break the mirror to use as a weapon.  However, inmates are allowed to shave in [an area of the Segregation Unit equipped with mirrors] while under supervision of the correctional staff.

• There are several programs that are offered [for eligible inmates] at Easterling Correctional Facility . . . .

• Inmates are issued clothes for which they are responsible . . . during their incarceration.  When inmates are placed in Segregation, they are issue[d] white jumpsuits and blue slide shoes.  Their state issued clothes and white tennis shoes are then stored until they are released to Population.

• Institutional regulations are taught during orientation.  These regulations are also published and maintained in the law library.  Inmates have access to all rules and regulations.

• Inmates are placed in a restricted privilege dormitory, not Segregation, when they have been issued behavior citations.  This is a dormitory not individual cells.

• Recently, the Law Library burned.  A temporary library was established.  The temporary Law Library is adequate and computerized.  The law clerk assists the inmates with research.  It is true that inmates are assigned slots to utilize the law library, which is for security concerns.  The law clerk visits the Segregation area to assist inmates with research.

• Laundry bags are picked up once a week for washing; however, Segregation jumpsuits are picked up daily for washing.

• Correctional staff [are required to follow] all administrative regulations and

16

institutional standard operating procedures for the custody and control of inmates.

• Medical decisions are made by contract medical staff and not correctional staff.

• Dental services are contracted; however, any inmate may sign up to see the dentist.  Priority [for dental services] are established by the dental staff.

*Exh. A to the Defendants' Special Report - Doc. No. 14-1* at 1-3.  With respect to the water quality issues raised by Golston, the evidentiary materials indicate that these issues are without merit as the water used at Easterling via Clio Water Works was "in full compliance with the Safe Drinking Water Act and all Alabama Department of Environmental Management regulations" during the period of time relevant to the complaint.  *Exh. 1 to the Defendants' May 28, 2013 Response - Doc. No. 27-1* at 2-6.

Although overcrowding and under staffing exists in the Alabama prison system, these facts, standing alone, are not dispositive of the issues before this court.  Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain.  *Id*. at 346.  Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement."  *Id*. at 348 (citation omitted).

"[T]he Constitution does not mandate comfortable prisons."   If prison

> conditions are merely "restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Generally speaking, prison conditions rise to the level of an Eighth Amendment violation only when they "involve the wanton and unnecessary infliction of pain."

*Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (internal citations omitted).

Although, "the Constitution 'does not mandate comfortable prisons' . . . neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citation omitted); *Rhodes*, 452 U.S. at 345-46 (Conditions may not be "barbarous" nor may they contravene society's "evolving standards of decency."). Consequently, the conditions under which a prisoner is confined are subject to constitutional scrutiny. *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eight Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)); *Helling*, 509 U.S. at 31-32. To demonstrate an Eighth Amendment violation regarding conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry. *Farmer*, 511 U.S. at 834. In *Farmer*, the Court identified both objective and subjective elements necessary to establish an Eighth Amendment violation. With respect to the requisite objective elements, an inmate must first show "an objectively

substantial risk of serious harm . . . exist[ed].  Second, once it is established that the official

is aware of this substantial risk, the official must react to this risk in an objectively

unreasonable manner." *Marsh*, 268 F.3d 1028-29.   As to the subjective elements,

> the official must both be aware of facts from which the inference could be
> drawn that a substantial risk of serious harm exists, and he must also draw
> the inference . . . .   The Eighth Amendment does not outlaw cruel and
> unusual "conditions"; it outlaws cruel and unusual "punishments." . . . ***[A]n
> official's failure to alleviate a significant risk that he should have
> perceived but did not, while no cause for commendation, cannot under our
> cases be condemned as the infliction of punishment***.

*Farmer*, 511 U.S. at 837-38 (emphasis added); *Campbell v. Sikes*, 169 F.3d 1353, 1364

(11th Cir. 1999) ("Proof that the defendant should have perceived the risk, but did not, is

insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).   The

conduct at issue

> must involve more than ordinary lack of due care for the prisoner's interests
> or safety . . . .   It is ***obduracy and wantonness, not inadvertence or error in
> good faith***, that characterize the conduct prohibited by the Cruel and Unusual
> Punishments Clause, whether that conduct occurs in connection with
> establishing conditions of confinement, supplying medical needs, or restoring
> official control over a tumultuous cellblock.

*Whitley v. Albers*, 475 U.S. 312, 319 (1986) (emphasis added).

The living conditions within a correctional facility will constitute cruel and unusual

punishment when the conditions involve or result in "wanton and unnecessary infliction

of pain, [or] . . . [are] grossly disproportionate to the severity of the crime warranting

imprisonment." *Rhodes*, 452 U.S. at 347.  "Conditions . . . alone or in combination, may

deprive inmates of the minimal civilized measure of life's necessities.  Such conditions could be cruel and unusual under the contemporary standard of decency . . . .  But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional."  *Id*. at 347.  To determine whether conditions of confinement constitute cruel and unusual punishment, the court must look to the effect the condition has upon the inmate.  *Id*. at 366.  In a case involving conditions of confinement generally or several different conditions, the court should consider whether the claims together amount to conditions which fall below constitutional standards.  *Hamm v. De Kalb Cnty.*, 774 F.2d 1567 (11th Cir. 1985), *cert. denied Hamm v. De Kalb Cnty.*, 475 U.S. 1096 (1986); *see also Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991).  The court's consideration of whether the totality of a plaintiff's claims amount to conditions which fall below applicable constitutional standards is limited by the Supreme Court's admonishment that

> *[s]ome* conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need . . . .  To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes.  Nothing so amorphous as "overall conditions" can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists.

*Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991) (emphasis in original).

A prison official may likewise be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's health or safety when the official knows that

the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to

take reasonable measures to abate it.  *Farmer*, 511 U.S. at 828.

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834-38, 114 S. Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324-25, 115 L. Ed. 2d 271 (1991) . . . .  Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists - and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).  "The known risk of injury must

be a strong likelihood, rather than a mere possibility before [the responsible official's]

failure to act can constitute deliberate indifference."  *Brown v. Hughes*, 894 F.2d 1533,

1537 (11th Cir. 1990) (citations and internal quotations omitted).  As the foregoing makes

clear, "[m]erely negligent failure to protect an inmate . . . does not justify liability under

section 1983."  *Id*.

(i) <u>General Physical Conditions</u>.  Golston presents conclusory allegations regarding

the state of repair of Easterling, including claims with respect to peeling paint, broken or

missing windows, small windows and rusted tray doors.  Despite Golston's allegations

regarding the aforementioned physical conditions present at Easterling, he does not

establish that the above described conditions denied him the minimal civilized measure of

life's necessities or subjected him to a wanton and unnecessary infliction of pain.  *Wilson*,

21

501 U.S. at 298-99; *Rhodes*, 452 U.S. at 347.  Furthermore, Golston fails to demonstrate deliberate indifference or reckless disregard by the named defendants with respect to his health or safety with respect to these conditions.  Specifically, he does not identify any particular condition of which the defendants were aware from which an inference could be drawn that a substantial risk of serious harm existed.  The record is also devoid of any evidence showing that the defendants drew the requisite inference.  Consequently, summary judgment is due to be granted in favor of the defendants on the Golston's claims attacking general physical conditions at Easterling.  *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999); *see also Carter*, 352 F.3d at 1349-50.

(ii) Chains on Cell Doors, No Visual Contact with Cubicle Officer, Inadequate Cell Checks, Lack of Classification System to Determine Inmate Compatibility, Small Size of Segregation Cells, High Noise Level, Inadequate Meal Portions, Cold Meals, Laundering of Inmate Clothing, Low Water Pressure, Foul Odor of Water, Cleanliness of Cells, Denial of Lotion/Grease, Provision of Combs Instead of Hairbrushes, No Hot/Cold Running Water, Cleanliness of Cells, No Access to Ice in Winter Months, Lack of Access to Rules and Regulations, Idleness, Denial of Mirrors, Exposure to Elements and Denial of Privileges.  The Constitution does not mandate that prisons be comfortable, *Rhodes*, 452 U.S. at 349, and "a prisoner's mere discomfort, without more, does not offend the Eighth Amendment." *Chandler v. Crosby*, 379 F.3d 1278, 1296 (11th Cir. 2004).  None of the

above listed conditions of confinement present a severe or extreme condition that posed an unreasonable risk of serious harm to Golston's health or safety. In addition, Golston has not alleged that he suffered requisite harm as a result of the use of chains on cell doors, the security measures employed at Easterling, the manner in which inmates are allowed to identify enemies, meal portions or temperature, the laundering of his clothes, low water pressure, water odor, a lack of lotion or grease, provision of combs, denial of a mirror in his cell, low water pressure, inattentive guards or occasional exposure to outdoor weather conditions when traveling to/from areas of the facility. *See Chandler*, 379 F.3d at 1289 (holding that a prisoner must prove that the prison condition he complains of is sufficiently serious and "extreme" to violate the Eighth Amendment). Golston's mere subjective beliefs and conclusory allegations regarding these conditions do not create a genuine dispute of material and, as such, "are insufficient to withstand summary judgment." *Holifield*, 115 F.3d at 1564 n.6. Accordingly, the court concludes that these alleged conditions do not rise to the level of an Eighth Amendment violation. *Alfred v. Bryant*, 378 F. App'x 977, 980 (11th Cir. 2010) ("'Inmates cannot expect the amenities, conveniences and services of a good hotel.'" (quoting *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988))).

To the extent these allegations can be construed to allege a claim of deliberate indifference to the plaintiff's health or safety arising under the Eighth Amendment, the

court concludes that the deliberate indifference claim entitles Golston to no relief. Specifically, Golston presents no evidence that the named defendants had knowledge of specific facts from which an inference could be drawn that a substantial risk of harm existed, that these defendants actually drew this inference and thereafter ignored the risk. Golston has therefore failed to establish each of the requisite elements of a deliberate indifference claim regarding the conditions about which he complains. *Carter*, 352 F.3d at 1350 ("Plaintiff has failed to establish that the Defendant[s] had a subjective awareness of a substantial risk of serious physical [harm] to Plaintiff; thus, Plaintiff has failed to establish a required element of this claim.  When viewing the evidence most favorably toward Plaintiff, a claim for deliberate indifference has not been established . . . .").  Thus, summary judgment is due to be granted in favor of the defendants.

(iii) <u>Presence of Sewage</u>.  Golston alleges that raw sewage is at times present in the living areas and tiers of Easterling.  *Complaint - Doc. No. 1* at 5.  Other than his self-serving conclusory allegations, Golston presents no evidence to support this allegation. The correctional defendants deny that raw sewage is commonly present at Easterling and assert that when plumbing issues arise they are immediately referred to a maintenance crew for repairs.

Golston fails to meet his burden at the summary judgement stage as he does not establish that the allegation regarding the presence of sewage constituted a denial of the

minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain. *Wilson*, 501 U.S. at 297; *Rhodes*, 452 U.S. at 347. Hence, summary judgment is due to be granted in favor of the defendants.

(iv) <u>Totality of Conditions</u>. The court has undertaken a thorough and exhaustive review of the claims presented by Golston, the responses to these claims by the defendants and the probative evidentiary materials submitted by the defendants. After such review, the court finds that the challenged conditions though uncomfortable, inconvenient, unpleasant and/or objectionable were not so extreme as to violate the Eighth Amendment. *Chandler v. Baird*, 926 F.2d at 1289 (11th Cir. 1991). Specifically, the totality of the claims before this court do not amount to conditions which fall below applicable constitutional standards as Golston failed to demonstrate that the challenged conditions had "a mutually enforcing effect that produce[d] the deprivation of a single, identifiable human need." *Wilson*, 501 U.S. at 304. "To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id*. Consequently, summary judgment is due to be granted in favor of the defendants on these claims. *See McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999); *see also Carter*, 352 F.3d at 1349-50.

### E.  Access to Dental Treatment

Golston complains that only inmates with chronic conditions are allowed access to dental treatment.  Other than his self-serving conclusory allegation, Golston presents no evidence to support this claim.  The defendants adamantly deny this allegation and aver that all inmates have access to dental treatment through the sick call process utilized within the prison system.  Specifically, an inmate may request treatment for a dental condition at any time and the request is assessed by health care personnel who are responsible for determining the necessary course of treatment.  If warranted, the inmate will be referred to a dental professional for further evaluation and, if necessary, treatment.  It is undisputed that decisions regarding dental treatment are not made by correctional officials.

Under the circumstances of this case, Golston seeks relief from the defendants for evaluation decisions and treatment furnished by medical/dental personnel.  Assuming *arguendo* the defendants exerted some authority over the manner in which those persons responsible for the provision of dental treatment rendered such treatment, the law is well settled

> that Government officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior* [or vicarious liability]. . . . *Robertson v. Sichel*, 127 U.S. 507, 515-516, 8 S. Ct. 1286, 3 L. Ed. 203 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties").  Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

26

*Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1035 (11th Cir. 2001) (A supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)) (42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.).  "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677.  Thus, liability for dental treatment provided to Golston could attach to the correctional defendants only if they "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

Golston, however, has presented no evidence and the court cannot envision the existence of any evidence which would create a genuine issue of disputed fact with respect to deliberate indifference by the defendants.  The record is devoid of evidence indicating

that these defendants personally participated in or had any involvement, direct or otherwise, with the dental treatment provided to Golston; rather, it is undisputed that correctional officials do not decide which inmates receive dental treatment nor do they participate in the provision of such treatment to inmates. The evidentiary materials before the court demonstrate that health care personnel make all decisions relative to referral of inmates for dental treatment and any course of treatment provided to Golston would have been provided by either medical or dental personnel in accordance with their professional judgment upon assessment of his condition.

In light of the foregoing, the defendants can be held liable for decisions of medical/dental personnel only if their actions bear a causal relationship to the purported violation of Golston's constitutional rights. To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of the defendants, Golston must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendant] on notice of the need to correct the alleged deprivation, and [he] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in deliberate indifference to [his dental needs], or . . . facts [that] support an inference that [the correctional defendants] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted). After extensive review of

28

the pleadings and evidentiary materials submitted in this case, it is clear that Golston has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that the defendants directed medical or dental personnel to act unlawfully or knew that they would act/acted unlawfully and failed to stop such action.  In addition, Golston has presented no evidence of obvious, flagrant or rampant abuse of continuing duration in the face of which these defendants failed to take corrective action; instead, it is clear that  the defendants provided Golston access to dental care.  Finally, the court finds that the challenged course of dental treatment did not occur pursuant to a policy enacted by the defendants.  Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not justified.  *Cf. Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990); *Turner v. Safely*, 482 U.S. 78 (1987).  Summary judgment is therefore due to be granted in favor of the defendants on the dental treatment claim.

## F.  Medical Co-Payment

Golston complains that his constitutional rights were violated by assessment of a $3.00 co-payment for partial payment of costs attendant to his receipt of medical treatment. This action, standing alone, does not violate the Constitution.  The mere fact that Golston is charged a nominal fee or co-payment for medical treatment does not in any way deprive him of a protected right, privilege or immunity.  *Shapley v. Nevada Bd. of State Prison*

*Comm'rs*, 766 F.2d 404, 408 (9th Cir. 1985) (imposition of fee for medical treatment provided to an inmate does not amount to a constitutional violation); *Bester v. Wilson*, 2000 WL 1367984 at *8 (S.D. Ala. Aug. 18, 2000) ("[T]he charging of a fee to prisoners for medical treatment from their [available] funds has been held to be constitutional when challenged on several due process and Eighth Amendment grounds."). Golston does not allege nor is there any evidence indicating that he was denied medical treatment because he was unable to pay the fee; instead, the evidentiary materials submitted by the defendants establish that medical treatment is provided to inmates despite their inability to provide a co-payment. Since Golston has failed to allege a violation of his constitutional rights with respect to the assessment/collection of fees associated with medical treatment, the defendants are entitled to summary judgment on this claim.

### G.  Money Order Processing Fee

Golston challenges the Alabama Department of Corrections' imposition of a $1.00 processing fee for money orders sent to inmates through the mail. He contends that imposition of the processing fee violates his constitutional rights.[3] The policy applicable to the challenged processing fee became effective on September 1, 2010 and permitted the Alabama Department of Corrections to collect a $1.00 processing fee for each money order received through the mail that is processed by correctional officials and deposited into an

---

[3] While Golston argues that the processing fee is violative of his Eighth Amendment rights, it is clear that this claim is more appropriately analyzed under the Due Process Clause of the Fourteenth Amendment which provides that no state "shall deprive any person of life, liberty, or property without due process of law."

inmate's account.  *King v. Boyd*, 2012 WL 6923804 at *9-10 (M.D. Ala. 2012); *Colin v. Boyd*, 2012 WL 2052680 at *7 (M.D. Ala. 2012).

Although Golston complains about being assessed a processing fee for money orders he receives, the court finds that the prison system has a reasonable interest in defraying the costs of incarceration for purely discretionary services, the provision of which may include charging inmates related to costs associated with expenses incurred by correctional officials in allowing inmates to maintain funds in a prison account.[4]  Put another way, the plaintiff has no constitutionally protected right to avoid payment of the costs and/or fees associated with his desire to have access to various prison privileges including the availability of an inmate money account.  *See Wolff v. McDonnell,* 418 U.S. 539, 556 (1974) ("[T]he fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed."); *Givens*, 381 F.3d at 1065 (concluding that Alabama has not created a property interest for inmates in the interest that accrues on their PMOD accounts and correctional officials may utilize interest earned on the inmate accounts to defray the considerable costs associated with maintaining the accounts); *Jensen v. Kleckler*, 648 F.2d 1179, 1183 (8th Cir. 1981) (holding that there was no basis for a due process claim where deduction from prisoner accounts for postage were "assessment[s] for

---

[4]Inmate PMOD accounts are maintained by the Alabama Department of Corrections as a convenience for inmates at a considerable cost to the Department.  *Givens v. Ala. Dep't of Corrs.*, 381 F.3d 1064, 1065 (11th Cir. 2004).

value received" and plaintiffs did not contend that they did not receive the services for which they were charged); *Slade v. Hampton Rd. Reg'l Jail*, 407 F.3d 243, 251-53 (4th Cir. 2005) (holding that imposition of a $1.00 per day room and board charge does not amount to a "punishment or fine" nor does the automatic deduction of this fee from an inmate's trust fund account constitute an unconstitutional interference with a property interest). Accordingly, the court concludes that the assessment of a nominal fee on money orders sent to inmates for the purpose of defraying some of the costs associated with processing such transactions, without more, fails to state a violation of an inmate's federally protected constitutional rights.[5] *See Sandin v. Connor*, 515 U.S. 472 (1995).

## H. Violation of Administrative Regulations

Golstson alleges that correctional officials at Easterling violate administrative regulations governing segregation and disciplinary matters. The mere fact that agency regulations or procedures have been violated does not by itself raise a constitutional issue. *United States v. Caceres*, 440 U.S. 741, 751-52 (1979); *Magluta v. Samples*, 375 F.3d 1269, 1279 n.7 (11th Cir. 2004); *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996); *Sandin v. Conner*, 515 U.S. 472 (1995); *Harris v. Birmingham Bd. of Educ.*, 817 F.2d 1525 (11th Cir. 1987). Thus, this claim provides Golston no basis for relief.

---

[5]The court is unaware of any basis under which an inmate should be afforded greater protection by the Constitution from the assessment of fees and costs associated with the voluntary consumption and/or utilization of optional goods and services, those which are not associated with the provision of basic human needs, than is afforded an ordinary free-world citizen.

**I. Access to Court**

Golston asserts that while confined in segregation he did not have physical access to the law library and the law clerks assigned to the segregation unit failed to provide adequate assistance to him. He further complains that the law library at Easterling is not sufficient to meet the needs of inmates. The court construes this allegation as one asserting a denial of access to the court.

The law directs that incarcerated persons are entitled to "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds v. Smith*, 430 U.S. 817, 825 (1977). In *Lewis v. Casey*, 518 U.S. 343 (1996), the Supreme Court clarified and limited the right to assistance recognized in *Bounds*. Specifically, the Court held that "an inmate alleging a violation of *Bounds* must show actual injury" arising from the alleged inadequacies in the law library, legal assistance program or access provided by officials. *Lewis*, 518 U.S. at 349. In identifying the particular right protected by *Bounds*, the Court explained that

> *Bounds* established no . . . right [to a law library or to legal assistance]. The right that *Bounds* acknowledged was the (already well-established) right of ***access to the courts*** . . . . [P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring "a reasonably adequate opportunity to present claimed violations of fundamental  constitutional rights to the courts."

*Id*. at 350-51 (emphasis in original) (citations omitted). The Court further opined *Bounds* did not require "that the State . . . enable the prisoner to ***discover grievances***, and to ***litigate***

*effectively* once in court . . . .   To demand the conferral of such sophisticated legal capabilities upon a mostly uneducated and indeed largely illiterate prison population is [not something] . . . the Constitution requires." *Id*. at 354 (emphasis in original).

The Court similarly rejected the argument that the mere claim of a systemic defect, without a showing of actual injury, presented a claim sufficient to confer standing. *Id*. at 349.   Moreover, *Lewis* emphasized that a *Bounds* violation is related to the lack of an inmate's capability to present claims. 518 U.S. at 356. "*Bounds*, which as we have said guarantees no particular methodology but rather the conferral of a capability -- the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.   When any inmate . . . shows that an actionable claim of this nature which he desired to bring has been lost or rejected, or that the presentation of such a claim is currently being prevented, because this capability of filing suit has not been provided, he demonstrates" the requisite actual injury. *Lewis*, 518 U.S. at 356.   Finally, the Court discerned that the injury requirement is satisfied only when an inmate has been denied "a reasonably adequate opportunity to file nonfrivolous legal claims challenging [his] convictions or conditions of confinement . . . .   *[I]t is that capability, rather than the capability of turning pages in a law library, that is the touchstone*." *Id*. at 356-57 (emphasis added).   "[T]he Constitution does not require that prisoners . . . be able to conduct generalized research, but only that they be able to present their grievances to the

courts - a more limited capability that can be produced by a much more limited degree of legal assistance." *Id*. at 360.  The Court admonished that federal courts should allow prison officials to determine the best method of ensuring that inmates are provided a reasonably adequate opportunity to present their nonfrivolous claims of constitutional violations to the courts. *Id*. at 356.  A federal district court must "'scrupulously respect[] the limits on [its] role,' by 'not . . . thrust[ing] itself into prison administration' and instead permitting '[p]rison administrators [to] exercis[e] wide discretion within the bounds of constitutional requirements.'" *Id*. at 363 (quoting *Bounds*, 430 U.S. at 832-33).

Golston presents only a conclusory allegation of a constitutional violation and fails to allege any shortcomings with respect to the legal access provided to him during his confinement in segregation which actually hindered his efforts to pursue claims before this or any other court.  Although Golston alleges that while confined in segregation he did not have physical access to the law library or competent legal assistance, it is undisputed that at all times while housed therein correctional officials allowed Golston access to legal materials from the prison law library and in no way inhibited his preparation of legal documents, filing of pleadings or processing of any cause of action.  Throughout the proceedings in this case, Golston demonstrates he is both proficient and prolific at presenting and arguing the claims of his choice to the court of his choosing.  Nothing in the record indicates that the challenged lack of access to materials or assistance improperly

impeded or adversely affected Golston's efforts to pursue nonfrivolous legal claims. Golston has utterly and completely failed to come forward with any evidence that the actions about which he complains deprived him of the ***capability*** of pursuing claims in this or any other court.   Hence, Golston does not establish he suffered the requisite injury, *Lewis*, 518 U.S. at 356, and the defendant is therefore entitled to summary judgment on the legal access claim.   *Barbour v. Haley*, 471 F.3d 1222, 1225 (11th Cir. 2006) (access to courts claim fails because plaintiff did not show any actual injury); *Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991) (An inmate is entitled to no relief on an access to courts claim in "the absence of any indications of ultimate prejudice or disadvantage.").

### J.  Equal Protection Claims

Golston alleges that inmates in segregation do not receive the same meal options as inmates in general population, black inmates are not provided a hair brush, skin lotion or hair grease for conditions he deems unique to individuals of this race, some inmates at Easterling are allowed to maintain possession of their state issued white jeans while his jeans were confiscated from him when he entered Easterling, and inmates with appropriate prison/criminal records are allowed access to prison programs.   The defendants deny these allegations and maintain that none of these allegations constitute discrimination violative of the Constitution.   Specifically, the defendants assert that meal portions are the same for both segregation and general population inmates, no inmates are allowed to possess

36

restricted items such as lotion, grease or hairbrushes due to security concerns and all inmates are provided the same items of clothing during their confinement.

"Despite the tendency of all rights 'to declare themselves absolute to their logical extreme,' there are obviously limits beyond which the equal protection analysis may not be pressed . . . .   The Fourteenth Amendment 'does not require absolute equality or precisely equal advantages,'. . . nor does it require the State to 'equalize [prison] conditions.'"  *Ross v. Moffitt*, 417 U.S. 600, 611-12 (1974); *Hammond v. Auburn Univ.*, 669 F. Supp. 1555, 1563 (M.D. Ala. 1987) ("The Equal Protection Clause of the Fourteenth Amendment does not require all persons to be treated either identically or equally.").  In order to establish a claim cognizable under the Equal Protection Clause, "a prisoner must [at a minimum] demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis."  *Sweet v. Sec'y, Dep't of Corrs.*, 467 F.3d 1311, 1318-19 (11th Cir. 2006) (citing *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001); *Damiano v. Florida Parole and Prob. Comm'n*, 785 F.2d 929, 932-33 (11th Cir. 1986)).  "[O]fficial action will not be held unconstitutional solely because it results in a . . . disproportionate impact . . . .  Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,

429 U.S. 252, 264-65 (1977).  "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decision maker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (footnote and citation omitted); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991).  Evidence which merely indicates disparity of treatment or even arbitrary administration of state powers, rather than instances of purposeful or invidious discrimination, is insufficient to show discriminatory intent. *McKleskey v. Kemp*, 481 U.S. 279, 292 (1987).

Since this case is before the court on a properly supported motion for summary judgment from the defendants, Golston bears the burden of producing evidence which would be admissible at trial sufficient to show that the defendants provided more favorable treatment to other similarly situated individuals and acted in this manner due to intentional discrimination.  *Celotex*, 477 U.S. at 322-24; *Anderson*, 477 U.S. at 249 (to preclude summary judgment, plaintiff must present significant probative evidence showing defendant provided more favorable treatment to similarly situated persons and did so as the result of intentional discrimination); *E & T Realty Co. v. Strickland*, 830 F.2d 1107, 1114 (11th Cir. 1987), *cert. denied*, 485 U.S. 961 (1988) (Intentional discrimination on the part of the defendant in providing the challenged disparate treatment is required.  "Mere error

or mistake in judgment" or "[e]ven arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause."). The plaintiff cannot rest on conclusory allegations of a constitutional violation to defeat summary judgment nor is "[t]he mere existence of a scintilla of evidence in support of [his] position" sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252.

Initially, it is clear that inmates confined in segregation and those housed in general population are not similarly situated. Moreover, inmates confined in segregation do not constitute a protected class. Each of the foregoing statements is equally true for inmates with prison and/or criminal records that render them ineligible for favorable programs when compared with inmates whose records render them eligible for these programs. It is also not a denial of equal protection to treat serious offenders and unruly inmates differently from other prisoners. *See Hendking v. Smith*, 781 F.2d 850, 852 (11th Cir. 1986). Consequently, those claims Golston bases on alleged differential treatment of segregation and general population inmates and differential treatment between inmates with differing records are without merit. With respect to the hairbrush/lotion/grease claim, the defendants assert that no inmate is allowed to maintain these items in their possession for security reasons. Golston does not dispute this assertion but argues that as a black inmate he is entitled to preferential treatment with regard to possession of these items. Finally, Golston makes the conslusory allegation that "some inmates" at Easterling have

maintained possession of their white jeans while he was not permitted to do so.

Golston fails to identify any similarly situated inmate who received differential favorable treatment from the defendants regarding possession of a hairbrush, lotion or grease; rather, he seeks preferential treatment based on his race.  Thus, this "equal protection claim necessarily fails . . . because [Golston] has not shown that he was treated differently from other, similarly situated prisoners." *Sweet*, 467 F.3d at 1319.  In addition, the defendants maintain that Golston and all inmates are denied these items due to security concerns.  Golston has utterly and completely failed to present evidence, significantly probative or otherwise, that race constituted a motivating factor in the actions of the defendants regarding a denial of the items at issue.  The defendants are therefore entitled to summary judgment on the equal protection claim arising from alleged racial discrimination.

The claims regarding denial of white jeans and access to prison programs likewise provide no basis for relief

> because [Golston] has not alleged . . . that he was treated differently on account of some form of ***invidious discrimination*** tied to a constitutionally protected interest.  He has not even claimed that he was treated differently from others because of race, religion, or national origin [and actually concedes the defendants proceeded against all inmates in the same manner].  *See Snowden v. Hughes*, 321 U.S. 1, 8, 64 S. Ct. 397, 88 L. Ed. 497 (1944) ("The unlawful administration . . . of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination."); *McQueary v.*

40

> *Blodgett*, 924 F.2d 829, 835 (9th Cir. 1991) (rejecting a claim that a state prisoner's equal protection rights were violated because he received a longer sentence than some other prisoners and holding that "a mere demonstration of inequality is not enough; the Constitution does not require **identical** treatment. There must be an allegation of invidiousness or illegitimacy in the statutory scheme before a cognizable claim arises: it is a settled rule that the Fourteenth Amendment guarantees equal laws, not equal results." (internal quotation marks omitted)); *see also Cruz v. Skelton*, 543 F.2d 86, 92-93 (5th Cir. 1976) (affirming dismissal of prisoner's equal protection claim because there was no allegation of "'invidious discrimination' based on such considerations as race, religion, national origin, or poverty").

*Sweet*, 467 F.3d at 1319 (emphasis in original); *McKleskey*, 481 U.S. at 292 (neither disparity of treatment nor arbitrary action is sufficient to show discriminatory intent). Thus, summary judgment is due be granted in favor of the defendants on Golston's claims alleging violations of his equal protection rights with respect to the denial of with jeans and eligibility for prison programs.

### K.  Excessive Force and Failure to Protect

(i) <u>Qualified Immunity</u>. With respect to Golston's excessive force failure to protect claims against defendants Enfinger and Williams in their individual capacities, the defendants argue they are entitled to qualified immunity.

> Under the doctrine of qualified immunity, if the defendant establishes that he was acting within the scope of his discretionary authority when the alleged excessive force occurred, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. *Skop* [*v. City of Atlanta*, 485 F.3d 1130, 1136-37 (11th Cir. 2007)]. To defeat qualified immunity, a plaintiff must show both that a constitutional violation occurred and that the constitutional right violated was clearly established. *Fennell* [*v. Gilstrap*, 559 F.3d 1212, 1216 (11th Cir. 2009) (per curiam)]. In Eighth Amendment

> excessive force cases, however, "the subjective element required to establish [the constitutional violation] is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution." *Johnson v. Breeden*, 280 F.3d 1308, 1321-22 (11th Cir. 2002).

*Bowden v. Stokely*, 576 F. App'x 951, 954-55 (11th Cir. 2014) (per curiam). "Moreover, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002). "While . . . there is no per se rule barring qualified immunity in Eighth Amendment cases, where the plaintiff has sufficiently alleged or shown a material dispute of fact as to an excessive force claim, summary judgment based on qualified immunity is not appropriate." *Bowden*, 576 F. App'x at 956. Accordingly, this court will consider whether the plaintiff's allegations that Enfinger maliciously and sadistically used excessive force against him while Williams witnessed the attack and failed to intervene, which the court must take as true for purposes of summary judgment, sets forth a violation of his Eighth Amendment rights.

(ii)  Excessive Force and Failure to Protect.  Claims of excessive force by prison officials against convicted inmates are governed by the Eighth Amendment's proscription against cruel and unusual punishment. *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999). The standard applied to an Eighth Amendment excessive force claim contains both a subjective and objective component. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The

42

subjective component requires that prison "officials act[ed] with a sufficiently culpable state of mind." *Hudson*, 503 U.S. at 8 (internal quotations omitted). With respect to the objective component, a plaintiff must show that "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Id*. In addition, "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." *Id*. at 4. "Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). The court, however, further directed that "the relatively modest nature of [an inmate's] alleged injuries will no doubt limit the damages he may recover." *Id*. at 40.

> Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm." *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)); *see also Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992). To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, at 7-8, 112 S. Ct. 995; *see also Whitley*, 475 U.S. at 321, 106 S. Ct. 1078; *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir. 1996). From consideration of such factors, "inferences may be drawn as to whether the

use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur."  *Whitley*, 475 U.S. at 321, 106 S. Ct. 1078 (quoting *Johnson*, 481 F.2d at 1033).

*Skrtich*, 280 F.3d at 1300-01.  "'When prison officials maliciously and sadistically use force to cause harm,' the Court recognized, 'contemporary standards of decency always are violated . . . whether or not significant injury is evident.  Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.'"  *Wilkins*, 559 U.S. at 38 (quoting *Hudson*, 503 U.S. at 9).  Thus, in an excessive force case such as the one at hand, "the 'core judicial inquiry' is 'not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  *Bowden*, 576 F. App'x at 953 (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) (quotation marks omitted) (concluding that a gratuitous beating by prison guards, even without injuries requiring medical attention, violated a prisoner's Eighth Amendment rights)).

Golston asserts that on December 8, 2010 in the shift office at Easterling, defendant Enfinger "punched me in the face at least four times while my hands were cuffed behind my back in front of Sgt. Williams . . . without provocation.  Sgt. Williams encouraged it & did nothing to stop it."  *Complaint - Doc. No. 1* at 6.  In support of his allegations of excessive force and failure to protect, Golston avers that after requesting treatment for a

44

migraine headache from the cubicle officer and being advised to "sign up for sick call . . . . I turned to leave the cubicle [and] was blinded with pain from the light.  I stumbled into and kicked the trash can unintentionally.  COI Enfinger appeared, grabbed me by the arm, and directed me; 'Report to the Lobby.'  Whereupon, I complied without any resistance and submitted to being handcuffed behind my back.  At that point, another officer escorted me to the shift office." *Plaintiff's Exhibit 1 in Response to the Defendants' Report - Doc. No. 16-1* at 1-2.  After a discussion between an officer in the shift office and defendants Enfinger and Williams, Williams ordered Golston to sit on the bench outside the office.  Another officer entered the shift office and the discussion continued.  Williams eventually ordered Golston "back into the office.  I entered the office, still handcuffed behind my back and assuming that I was about to be maced, I kept my chin tucked tightly to my chest." *Id.* at 2.  Enfinger cursed Golston and then punched him in the face causing Golston to fall to the floor.

> This was done without provocation.  I did not kick at him.  [Enfinger and an unidentified officer] . . . punched and kicked me for an undetermined amount of time, while I tried to ball up in a tight fetal position . . . .  [T]hey [eventually] dragged me to my feet.  When I would not stand they ran my head into the wall.  All the while Sgt. Kerry Williams looked on and did nothing . . . to protect me.

*Id.*

Golston was then transported to the health care unit for treatment.  When the attending nurse, Rebecca Flowers, inquired as to his condition, Golston responded

> "I have a migraine headache."  She told me to hold my head up.  When I did,
> she said, "Ooh, you are bleeding."   She treated me and gave me some
> Tylenol.  Then she called Sgt. Kerry Williams, on the phone, and asked him
> "What do you want me to put on this body chart.["] . . . then said "Okay."
> I was released and placed in segregation.

*Id*. at 2-3.  Golston maintains that "Nurse Flowers failed to document the rather large goose

egg knot on my forehead . . . over my right temple.  Plus, the swelling of my right jaw,

which I thought might have been broken.  I could not masticate for several days and could

not eat for at least seventy-two hours."  *Id*. at 3.[6]

The defendants deny Golston's claim regarding the use of excessive force and the

alleged failure to protect him from such force.  Specifically, defendant Enfinger maintains

that on the night in question Golston

> approached me and stated that he needed to go to the Health Care Unit due
> to having a migraine headache.  The Health Care Unit was notified about the
> [request].  The Medical Staff stated that Inmate Golston had [previously] put
> in a sick call request [regarding suffering from migraine headaches] and was
> seen by the Medical Staff.  The Medical Staff also stated that Inmate Golston
> would have to sign up for sick call again.  I advised Inmate Golston to sign
> up for sick call again.  Inmate Golston became hostile and began kicking
> over garbage cans.  I escorted Inmate Golston out of Dorm C1 and into the
> lobby.  I handcuffed Inmate Golston to the rear and escorted Inmate Golston
> to the Shift Commander's Office.  At approximately 7:50 PM, I notified Sgt.
> Kerry Williams of the incident, Sgt. Williams verbally reprimanded Inmate
> Golston on his negative behavior.  As I was escorting Inmate Golston out of
> the Shift Commander's Office, Inmate Golston kicked towards me and I

---

[6]The body chart demonstrates Nurse Flowers examined Golston and determined that his vital signs were within normal range and he was breathing with ease.  *Exh. F to the Defendants' Special Report - Doc. No. 14-6*.  The nurse observed a "[s]mall scratch . . . to [Golston's right] forehead" and noted no other injuries to any area of his body.  *Id*.  Based on her observations, the nurse cleaned the scratch with normal saline, did not provide any instructions to Golston regarding additional treatment and released him to correctional officers.  *Id*.

restrained Inmate Golston to the floor.  Sgt. Williams instructed Officer
Rodney Johnson to escort Inmate Golston to the Health Care Unit for a
medical examination . . . .  At no time did I punch or kick Inmate Golston .
. . .

*Exh. E to the Defendants' Special Report - Doc. No. 14-5* at 1.  Sgt. Williams further avers

that on December 8, 2010 at approximately 7:50 p.m. Officer Enfinger advised him that

Golston

had become hostile and kicked over several garbage cans.  Officer Enfinger
handcuffed Inmate Golston to the rear and escorted him to the Shift
Commander's Office.  I questioned Inmate Golston about kicking over the
garbage cans in [the dorm].  Inmate Golston denied kicking over the garbage
cans.  I verbally reprimanded Inmate Golston on his negative behavior.  I
instructed Officer Enfinger to escort Inmate Golston out of the Shift
Commander's Office.  As Officer Enfinger was escorting Inmate Golston out
of the Shift Commander's Office, Inmate Golston kicked toward Officer
Enfinger.  Officer Enfinger restrained Inmate Golston by placing him on the
floor.  Officer Enfinger picked Inmate Golston off the floor.  I instructed
Officer Rodney Johnson to escort Inmate Golston to the Health Care Unit for
a medical exam . . . .  [Inmate Golston was charged with] Rule Violation
#63-Disorderly Conduct.  A Disciplinary Hearing was held on inmate
Golston.  Inmate Golston was found guilty for Disorderly Conduct.  At no
time was Inmate Golston punched or kicked . . . .

*Exh. D. to the Defendants' Special Report - Doc. No. 14-4.*

Even though the defendants dispute the version of events presented by Golston, the

court is required at this stage of the proceedings to view the facts in the light most

favorable to Golston and draw all reasonable inferences from those facts in his favor.

*Bradley v. Franklin Collection Serv., Inc.*, 739 F.3d 606, 608 (11th Cir. 2014).  In that

vein, Golston provides that defendant Enfinger repeatedly punched and kicked him without

47

provocation and while he posed no threat to Enfinger or the security of the facility. Golston further asserts that defendant Williams witnessed this attack without intervening to protect him from Enfinger.  Finally, Golston asserts that the challenged actions resulted in a cut and large knot on his forehead and swelling of his right jaw.  In sum, Golston avers "that he was the victim of an unprovoked attack in circumstances that did not present a risk of creating a disturbance or harming staff or other inmates.  This version of the events could support an excessive force claim despite the lack of serious injuries." *Bowden*, 576 F. App'x at 954.

As previously explained, the defendants deny Golston's allegations regarding the use of excessive force and maintain that at no time during the incident was more force used than necessary to subdue and gain control of Golston after he attempted to kick defendant Enfinger.  Nevertheless, viewing the facts in the light most favorable to Golston, the court concludes that defendants Enfinger and Williams are not entitled to qualified immunity as the plaintiff has alleged facts sufficient to survive their motion for summary judgment regarding the excessive force and failure to protect claims lodged against them.  *Skrtich*, 280 F.3d at 1301.  Specifically, disputed issues of material fact exist regarding the need for the use of force, the nature of the force used and whether the defendants acted "maliciously and sadistically" to cause harm.  Consequently, the motion for summary judgment with respect to the claims of excessive force and failure to protect lodged against defendants

Enfinger and Williams is due to be denied.

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The defendants' motion for summary judgment be GRANTED in part and DENIED in part as follows.

2. The defendants' motion for summary judgment with respect to the plaintiff's claims for monetary damages lodged against them in their official capacities be GRANTED and these claims be DISMISSED with prejudice as the defendants are entitled to absolute immunity from these claims.

3. The motion for summary judgment filed on behalf of defendants Gary Hetzel, Kenneth Sconyers and Gwendolyn Babers regarding all claims presented against these defendants in the remaining aspects of their official capacities and in all aspects of their individual capacities be GRANTED.

4. The motion for summary judgment filed on behalf of defendants Matthew Enfinger and Kerry Williams regarding all claims contained in the complaint, with the exception of the plaintiff's excessive force and failure to protect claims, be GRANTED.

5. The motion for summary judgment filed on behalf of defendants Matthew Enfinger and Kerry Williams with respect to the plaintiff's excessive force and failure to protect claims lodged against them in their official capacities seeking relief other than

monetary damages and in all aspects of their individual capacities be DENIED.

6.  All claims, with the exception of the plaintiff's surviving excessive force and failure to protect claims against defendants Matthew Enfinger and Kerry Williams, be DISMISSED with prejudice.

7. This case be set for a set for an evidentiary hearing before the undersigned on the plaintiff's claims of excessive force and failure to protect lodged against Matthew Enfinger and Kenneth Sconyers.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **February 9, 2015**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive, or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*,

661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 26th day of January, 2015.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE